U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

FEB 28 2008

LAWRENCE K. BAERMAN, CLERK
ALBANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,  :

                         v.  :

CHARLES DAVIDSON,  :
WILLIAM HOSKINS,
BRYAN BAILEY,  :
TOMAS SOTO CASTILLO,
WENDY MUDRA,  :

             Defendants.  :

---

**SUPERSEDING**
**INDICTMENT**

Criminal No. 07-CR-204 (LEK)

VIO: 8 U.S.C. §1324(a), 18 U.S.C. §2

(SIX FELONY COUNTS)

THE GRAND JURY CHARGES THAT:

## COUNT ONE
### (Conspiracy)

### A. INTRODUCTION

At all times material hereto:

1.     IFCO Systems North America ("IFCO"), a foreign corporation with U.S. headquarters in Houston, Texas, operated pallet services plants throughout the United States. IFCO plants procured, reconditioned and redistributed wooden pallets. IFCO had approximately 50 company-owned pallet plants and also conducted operations at off-site facilities, such as customer warehouses.

2.     IFCO established its new company-owned pallet plants under the umbrella of its "New Market Development" operations. Most of these new IFCO plants were established under the direction of IFCO's "Greenfield" group. Typically, during the first year of operations, the new plants were supervised by New Market Development managers and the respective IFCO Regional Vice President (of three) who would ultimately assume responsibility for the plant. The new IFCO plants included the plants in Albany, NY; Rittman, OH; Detroit, MI; Portland, OR; St. Louis, MO; Westborough, MA (Boston); and Toelle, UT (Salt Lake City).

### New Market Development Operations

3.    Defendant **CHARLES DAVIDSON** was the Director of New Market Development for IFCO. **DAVIDSON** supervised IFCO's New Market Development Managers, defendants **WILLIAM HOSKINS** and **BRYAN BAILEY**, Steven Means and James Rice. **DAVIDSON** also utilized two IFCO foremen, defendant **TOMAS SOTO CASTILLO** and at times, Abelino "Lino" Chicas, to set-up IFCO's new plants.

4.    Defendant **WILLIAM HOSKINS** was a New Market Development Manager for IFCO.

5.    Steven "Steve" Means was a New Market Development Manager for IFCO.

6.    James Rice was a New Market Development Manager for IFCO through the end of November 2005.

7.    Defendant **BRYAN BAILEY** was the general manager of the IFCO plant in Jackson, MS. Beginning in November 2005, **BAILEY** was a New Market Development Manager for IFCO.

8.    Defendant **TOMAS SOTO CASTILLO** was employed as a foreman at the IFCO plant in Cincinnati, Ohio. **SOTO CASTILLO** helped to set-up and staff IFCO's new plants. **SOTO CASTILLO**'s responsibilities included assisting with recruiting, hiring, training and managing Hispanic manual laborers for pallet worker positions at the plants.

9.    Abelino "Lino" Chicas was a foreman in one of IFCO's Houston-area pallet plants. In 2005, he was named a "systems manager." Chicas helped to set-up and staff IFCO's new plants in Albany and St. Louis, and to train and manage the pallet workers employed at these plants.

10.   Defendant **WENDY MUDRA** was IFCO's Human Resources Manager, with responsibility over all IFCO plants.

### The Albany IFCO Plant

11.   The Albany IFCO plant opened in October 2004 under the direction of defendants **CHARLES DAVIDSON** and **TOMAS SOTO CASTILLO**, and James Rice. Defendant **WILLIAM HOSKINS** supervised operations at the Albany plant from in or about November 2005, through in or about January 2006. IFCO also conducted operations within two customer

2

off-site warehouses near Albany, in Amsterdam and Wilton, New York.

      a.    Robert Belvin was the general manager of the Albany plant from in or about December 2004 through in or about January 2006.

      b.    Craig Losurdo was an assistant general manager of the Albany plant from in or about October 2004 through in or about June 2005.

      c.    Scott Dodge was an assistant general manager at the Albany plant from in or about January 2005 through in or about July 2005.

      d.    Dario Salzano was the assistant general manager at the Albany plant from in or about August 2005 through April 19, 2005.

12.    A government cooperating witness who presented himself as an illegal alien without identity documents was hired at the Albany plant in April 2005. While working at the company, the cooperating witness provided IFCO managers two different sets of identity documents, including a "green card" bearing someone else's photograph and three different social security numbers. In July 2005, the cooperating witness was promoted to the foreman position of the plant. He remained employed at the plant until the beginning of January 2006.

Other New IFCO Plants

13.    Following the opening of the Albany plant, defendant **CHARLES DAVIDSON** and IFCO's New Market Development managers opened additional plants as follows:

| New Plant Location | Opening Date | NMD Managers |
|---|---|---|
| Detroit, MI | December 2004 | **HOSKINS** and **SOTO CASTILLO** |
| Rittman, OH | December 2004 | Means and **SOTO CASTILLO** |
| Portland, OR | March 2005 | Means and **SOTO CASTILLO** |
| St. Louis, MO | July 2005 | **HOSKINS** and **SOTO CASTILLO** |
| Boston, MA | December 2005 | Rice, Means and **SOTO CASTILLO** |
| Salt Lake City, UT | December 2005 | Means, **BAILEY** and **SOTO CASTILLO** |

14.    Michael "Mike" Ames was the general manager of the Boston IFCO plant from in or about September 2005 through April 19, 2006.

3

The April 19, 2006 ICE Worksite Enforcement Action

15.     On April 19, 2006, Immigration and Customs Enforcement (ICE) and other agencies conducted a worksite enforcement action at approximately 45 of IFCO's company-owned pallet plants.  ICE agents detained approximately 1,187 unauthorized illegal alien workers at those plants, the majority of the foremen and manual laborers present at the plants.

16.     Nearly all of the pallet workers and foremen ICE encountered at the new IFCO plants were illegal aliens – for example, 24 of 26 pallet workers in Albany, 18 of 19 in Rittman, 20 of 21 in Boston, and all 27 in St. Louis, were illegal aliens.

Employee Immigration and Tax Forms

17.     A Form I-9, Employment Eligibility Verification Form (an "I-9 form"), is an immigration document that employers are required, by law, to complete for each employee in order to document that a new employee is authorized to work in the United States.

        a.      Section 1 of the form is to be completed and signed by the employee at the time the employee is hired.  Section 1 requires personal identifying information for the employee and an attestation, under penalty of perjury, by the employee that he/she is a citizen or national of the United States, a lawful permanent resident, or an alien authorized to work.  If Section 1 is prepared by a person other than the employee or is translated to the employee, the form requires the signature and attestation, under penalty of perjury, of the person who assisted in the completion of the form.

        b.      Section 2 of the I-9 form, "Employer Review and Verification" requires the employer to examine evidence of identity and employment eligibility within three days of employment, and to list the documents provided by the employee for employment verification.  Section 2 contains a certification section for the employer to attest, under penalty of perjury, that the employer has examined the documents presented, that the documents appear to be genuine, and that to the best of the employer's knowledge, the employee is eligible to work in the United States.

18.     A W-4 Employee's Withholding Allowance Certificate form (a W-4 form) is a document an employer must obtain from each employee in the United States, by law, for the purpose of determining the appropriate amount of federal income tax to be withheld from an employee's pay.  The employee is required to designate the number of allowances ("tax

4

exemptions") to which the employee is entitled and to sign the form under penalty of perjury. The amount of federal tax an employer withholds from an employee's paycheck is determined by the number of tax exemptions the employee claims; so that the higher the exemptions, the greater the pay to the employee.

## B. THE CONSPIRACY

From at least in or about April 2004, through on or about April 19, 2006, in the State and Northern District of New York, and elsewhere, the defendants,

### CHARLES DAVIDSON, WILLIAM HOSKINS, BRYAN BAILEY,
### TOMAS SOTO CASTILLO, and WENDY MUDRA,

conspired, combined, confederated and agreed, with others known and unknown, to:

(1) Conceal, harbor, and shield from detection, and to attempt to conceal, harbor and shield from detection, aliens, knowing and in reckless disregard of the fact that the aliens had come to, entered, and remained in the United States in violation of law, contrary to Title 8, United States Code, Section 1324(a)(1)(A)(iii);

(2) Encourage and induce aliens to reside in the United States, knowing and in reckless disregard of the fact that such residence was and would be in violation of law, contrary to Title 8, United States Code, Section 1324(a)(1)(A)(iv); and

(3) Transport and move, and to attempt to transport and move, aliens within the United States, knowing and in reckless disregard of the fact that the aliens had come to, entered, and remained in the United States in violation of law, and in furtherance of such violation of law, contrary to Title 8, United States Code, Section 1324(a)(1)(A)(ii).

## C. MANNER AND MEANS

1.      It was part of the conspiracy that conspirator IFCO managers would and did seek to employ Hispanic manual laborers at IFCO plants with little or no regard to the legal status of the workers.

2.      It was part of the conspiracy that when establishing a new IFCO plant, if Hispanic laborers could not be found in the communities of the plants, conspirator IFCO managers would and did move Hispanic alien laborers from outside of the area to staff the new plants.

Conspirator IFCO managers employed defendant **TOMAS SOTO CASTILLO**, who had worked for the company as an illegal alien himself, and Lino Chicas, to find Hispanic laborers for the plants.

3.      It was part of the conspiracy that conspirator IFCO managers would and did hire almost exclusively non-U.S. citizen Hispanic aliens for pallet workers jobs at IFCO's new plants without completing I-9 forms for the workers and/or falsifying I-9 forms, without the background screening applied to the pallet workers sent to staff IFCO's customers' off-site facilities, and without screening the aliens with employment verification systems available to the company.

4.      It was part of the conspiracy that conspirator IFCO managers and other conspirators would and did allow alien workers at IFCO plants, to use multiple social security numbers and identities during the course of employment – at times obtained through the assistance of IFCO managers.

5.      It was part of the conspiracy that conspirator IFCO managers and other conspirators would and did transport and attempt to transport illegal aliens, pay for the transportation of illegal aliens, and reimburse illegal aliens the cost of their transportation, all for the purpose of employing the aliens at IFCO plants.

6.      It was part of the conspiracy that conspirator IFCO managers would and did provide housing for Hispanic alien workers at IFCO plants who could not obtain housing on their own, by among other means, paying for hotel rooms, securing apartments and houses, paying rent, providing pay advances for rental costs.

7.      It was part of the conspiracy that conspirator IFCO managers would and did provide financial assistance to alien pallet workers at IFCO's new plants in addition to their pay, by cashing checks for workers, interceding on their behalf with bank personnel, transporting them to the bank to cash paychecks, giving them money for living expenses like food and clothing, and purchasing personal items for workers.

8.      It was part of the conspiracy that conspirator IFCO managers and other conspirators would and did assist alien workers at IFCO plants to receive more money in their weekly pay by submitting inflated tax exemptions on W-4 forms and causing less federal taxes to be withheld from their paychecks.

6

9.      It was part of the conspiracy that conspirator IFCO managers would and did take steps to avoid the arrest of illegal alien workers at IFCO plants, including moving illegal alien workers between IFCO plants to avoid difficulties with law enforcement and immigration authorities.

## D. OVERT ACTS

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed by the conspirators within the State and Northern District of New York and elsewhere:

### Overt Acts Concerning the Albany Plant

1.      On or about September 10, 2004, conspirator managers James Rice and Craig Losurdo solicited pallet workers for the Albany plant from among the transitory Hispanic workers at the stables at the race track in Saratoga, NY. Rice notified defendant **CHARLES DAVIDSON** of these recruitment efforts by email to which **DAVIDSON** replied, "Good work."

2.      In October 2004, defendant **TOMAS SOTO CASTILLO** traveled to Albany and assisted conspirator James Rice to recruit and hire Hispanic laborers for the Albany plant.

3.      In October 2004, defendant **TOMAS SOTO CASTILLO** sent two Hispanic alien laborers, known as C.F. and J.G., from Cincinnati to Albany to be the first two pallet workers to staff the plant.

4.      In October 2004, defendant **TOMAS SOTO CASTILLO** recruited two illegal alien Hispanic laborers, known as R.R. and V.F., from Long Island, NY, to work at the Albany plant.

5.      On or about October 12, 2004, defendant **TOMAS SOTO CASTILLO** and conspirator James Rice transported illegal aliens, known as R.R. and V.F., from the bus station in Albany to hotel rooms in Guilderland, N.Y., that the company had rented for them.

6.      Sometime between October 13 and October 20, 2004, defendant **TOMAS SOTO CASTILLO** transported the aliens known as C.F., J.G., R.R. and V.F. to a store in Rotterdam, N.Y., and bought them food and other personal items with company funds.

7.      On or about October 18, 2004, with the approval of defendant **CHARLES DAVIDSON**, conspirator James Rice rented a house under IFCO's name located on the premises

of the Governors Inn and Suites of Albany in Guilderland, New York, to house the Hispanic workers being hired to fill the pallet jobs at the Albany plant. Illegal alien workers from the plant occupied the house, known at Albany IFCO as the "white house," until on or about March 2005.

8.     On or about October 22, 2004, conspirator James Rice sent an email to defendant **CHARLES DAVIDSON**, an IFCO Regional Vice President, and others, which stated, in part:

> We currently have 7 employees, all Hispanic that either came over from Cinci or came up from New York city (Friends/relatives of the guys in Cinci). Most are inexperienced regarding pallets except 2. The rest are "training".... I have been recruiting for the last 6 weeks and with tomas' help have a line on about 5-6 more guys currently working at [a competitor pallet company].... These guys have committed to coming to work for us and I plan to take a bobtail Monday and gather up as many as possible and move them over to our newly rented house which has a motel next door where we can put them as well. The [pallet company] guys are somewhat on the fence though it would not surprise me if I get none of them. If that happens, we will have to place adds and hire folks off the street which will most likely be Caucasian. We also might be able to get some more people out of New York city which may be our saving grace.

9.     From on or about October 12, 2004, through at least on or about October 27, 2004, conspirators James Rice, Craig Losurdo, and others, provided the Hispanic alien pallet workers hired at the Albany plant with food, transportation costs and other financial assistance.

10.    On October 27, 2004, conspirator James Rice sent an email to defendant **CHARLES DAVIDSON** and an IFCO Regional Vice President, which stated, in part:

> Craig [Losurdo], [another person] and I have been feeding the guys almost every night and day for the last 2 weeks.... Whatever new guys we can recruit/relocate, I have been helping out financially until they get first checks and paying relocations expenses (bus, gas, etc.) Mostly bus fair right now but if Leno comes up week of Nov 8 and has anyone willing, I may buy them a seat on airplane with Leno. I have also paid deposit and first 2 weeks rent for guys...."

11.    On October 21, 2004, an Albany manager wrote defendant **TOMAS SOTO CASTILLO** a check for "relocation assistance" for new Albany pallet workers which **SOTO CASTILLO** cashed.

12.    On November 15, 2004, with the approval of defendant **CHARLES DAVIDSON**, James Rice executed a lease in IFCO's name for a four-bedroom house at 2449 Western Avenue, Altamont, N.Y., known at IFCO Albany as "the red house" to house the

Hispanic alien workers hired at the plant. Illegal alien workers resided in the house until the date of the ICE enforcement action.

13.     On or about November 26, 2004, conspirator Craig Losurdo advanced $600 in company funds to an illegal alien pallet worker to help the worker transport his illegal alien brother to the Albany plant to work.

14.     Sometime in November or December 2004, conspirator Craig Losurdo advanced $600 in company funds to an illegal alien pallet worker at the Albany plant for the worker to obtain fraudulent employment authorization documents for himself and another illegal alien worker at the plant.

15.     In November 2004, Lino Chicas helped relocate an illegal alien worker from an IFCO plant in Dallas to the Albany plant under a different identity after learning that the police were pursuing the worker.

16.     On December 16, 2004, conspirator James Rice purchased bus tickets to Albany to transport four illegal alien workers Lino Chicas had recruited in Houston for the Albany plant.

17.     On January 7, 2005, with the approval of defendant **CHARLES DAVIDSON** and at the direction of conspirator James Rice, conspirator Craig Losurdo executed a lease in IFCO's name for the first floor of a house located at 454 State Route 146, Guilderland Center, N.Y., known at IFCO Albany as "the yellow house" to house Hispanic alien workers hired at the plant. Illegal alien workers from the Albany plant resided at "the yellow house" until the date of the ICE enforcement action.

18.     On February 18, 2005, with the approval of defendant **CHARLES DAVIDSON** and at the direction of conspirator James Rice, conspirator Craig Losurdo executed a lease in IFCO's name for the two-bedroom upstairs apartment located at 2449 Western Avenue, Guilderland, N.Y., "the red house" to house Hispanic alien workers being hired at the plant. Illegal alien workers from the Albany plant resided in this apartment until the date of the ICE enforcement action.

19.     In January 2005, conspirator James Rice trained the new general manager hired for the plant, conspirator Robert Belvin, to hire Hispanic laborers for pallet worker positions, stating that IFCO had not had success with "white boys" and non-Hispanics in its plants. Rice

discouraged Belvin and Craig Losurdo from placing employment advertisements in general circulation newspapers that would only serve to attract "white boys."

20.     Sometime in January or February 2005, conspirator Robert Belvin sent a letter on IFCO letterhead to bank personnel that vouched for the Hispanic alien workers from the plant who were having difficulty cashing paychecks at the bank because of a lack of identity documents.  Conspirator Craig Losurdo also called bank personnel to vouch for the workers so that the bank would cash their checks

21.     Sometime in late February or early March 2005, conspirators Robert Belvin and Craig Losurdo reprimanded the office manager of the Albany plant who raised concerns about the quality of documents immigrant Hispanic workers had presented for employment.

22.     On March 2, 2005, conspirator James Rice forwarded email to defendant **CHARLES DAVIDSON** from the landlord of the industrial park in which the Albany plant was located which stated,

> Jim, Homeland Security is coming to your facility ASAP !!! Today!!!  Red Alert!  Someone turned you in for illegals!!

Defendant **DAVIDSON** responded by asking "Joke?" to which Rice responded,

> Not a joke.  They contacted the security folks at park wanting to stake out the place if you can believe that.  They know where our guys live and everything.  Either someone we fired is pissed or the police contacted them."

Defendant **DAVIDSON** responded, "Call me on the cell."

23.     On March 8, 2005, conspirator James Rice sent an email to defendants **CHARLES DAVIDSON** and **WILLIAM HOSKINS**, and Steve Means, stating, in part:

> Immigration hit one of our 3 houses last night where our foreman Jose lives.  They have him and another guy in custody on fraud charges based on their paperwork but Rob [Belvin] is going there now.  They left the other guys alone... Rob is trying to calm the other guys down but we may need some assistance in the short term depending on how the rest of the week pans out....We should be alright but who knows if everyone leaves.

24.     On March 8, 2005, after he learned that immigration agents had arrested 5 of the plant's pallet workers from the "yellow house" and the remainder of the pallet workers had either fled the area or failed to report for work out of fear of immigration, conspirator Robert Belvin

went to the Department of Homeland Security office in Albany, New York. Belvin falsely told agents there that he completed I-9 forms for workers at the Albany plant even though he did not know what an I-9 was.

25.     On March 8, 2005, after learning of the immigration arrests and the failure of the pallet workers to report to work, defendant **CHARLES DAVIDSON** and an IFCO Regional Vice President each called Robert Belvin and told him in sum and substance not to worry about the events, that the company would stand behind him through the loss in production, and that Belvin could obtain new workers for the plant from defendant **TOMAS SOTO CASTILLO** and conspirator Lino Chicas.

26.     Following the immigration arrests at the yellow house, conspirator managers at the Albany plant allowed alien workers who had not shown up for work out of fear of being apprehended by immigration to return to work, without any screening of the workers' employment eligibility.

27.     On or after March 8, 2005, at the direction of conspirator James Rice, and in order to prepare for the event that immigration authorities visited the Albany plant, conspirator Robert Belvin reviewed the files of the alien pallet workers at the plant and supplemented them with I-9 forms that had not been completed when the workers were hired. Belvin falsely attested to the workers' employment eligibility on the I-9 forms.

28.     On or about March 12, 2005, defendant **TOMAS SOTO CASTILLO** spoke to the illegal alien worker, known as R.R., who had fled from the Albany plant after the immigration arrests at the "yellow house" and encouraged R.R. and other alien workers who had fled with him to return to work at the Albany plant.

29.     On or about April 6, 2005, conspirator Robert Belvin hired a government cooperating witness who presented himself as an illegal alien without any work authorization documents. The cooperating witness told Belvin that he was going to purchase identity documents in New York City. Belvin instructed the cooperating witness to reside at "the red house."

30.    On April 20, 2005, conspirator assistant general manager Scott Dodge began to transport the government cooperating witness to and from work, along with the other aliens living at the "red house" that Dodge transported on a daily basis. Dodge asked the cooperating witness if he had "his papers" and offered to give him the passport of an alien worker who had recently left the plant and left his passport behind.

31.    On April 20, 2005, conspirators Craig Losurdo and Scott Dodge held a meeting with the Hispanic alien pallet workers at the plant during which they advised those who still were having difficulty cashing their paychecks the method which to obtain an additional form of identification in order to facilitate the cashing of their paychecks.

32.    On April 20, 2005, the government cooperating witness employed at the Albany plant presented fraudulent identity documents to James Rice and told him that the document bore someone else's photograph but he had been unable to purchase better documents. Rice photocopied the card and told the witness, "This will probably work....It looks like you to me," and instructed the Albany office manager to change the cooperating witness's name in payroll to match the fraudulent identity.

33.    On April 25, 2005, conspirator Robert Belvin asked the government cooperating witness to obtain fraudulent employment authorization documents for four illegal alien workers, arranged for the workers to have photos taken for the documents, and gave the cooperating witness time off from work to go purchase the documents. Belvin later used the fraudulent documents the cooperating witness provided (with ICE assistance) to employ the illegal alien workers at the Albany plant.

34.    In May 2005, the government cooperating witness was involved in a vehicle accident at the Albany plant. Conspirators Robert Belvin and Scott Dodge lied to a police officer who responded to investigate, stating that the cooperating witness employee was legally in the country. Belvin provided the officer with a copy of fraudulent documents from the witness's employee file.

35.    In May 2005, defendant **TOMAS SOTO CASTILLO** sent five Hispanic alien workers from Cincinnati to the Albany plant to work and requested compensation for moving the workers from conspirator Robert Belvin. In May 2005, defendant **WILLIAM HOSKINS** sent

12

an email to Belvin stating: "Tomas said that he sent 5 employees to Albany. He says that there was a deal for compensation if he brought employees to you. If that is the case Albany need to provide payment, if he is confused let me know."

36.     From in or about October 2004, through in or about June 2004, conspirator IFCO Albany managers, and others, including at times, James Rice, Robert Belvin, Craig Losurdo, Scott Dodge, and Dario Salzano, transported illegal alien workers to and from work on a daily basis, to the bank on a weekly basis to cash their paychecks, and to grocery stores, laundromats, and other locations in the Albany area.

37.     On or about August 1, 2005, the illegal alien worker known as R.R., who had fled from the Albany area after the immigration arrests at "the yellow house," returned to the Albany plant and re-applied for a job with a different social security number than he had previously used. An IFCO payroll supervisor notified defendant **WENDY MUDRA** by email that a rehire at the Albany plant had presented a "new and improved" social security number different than the one he used during his prior period of employment at the Albany plant from 2004-2005 and asked, "What should we do? Ignore and let him get 2 bogus W2s for 2005?" **MUDRA** instructed Albany managers that they could re-hire R.R. using the old social security number he had provided, and they did so.

38.     In August 2005, four illegal alien workers from the Albany plant were stopped by police and two were arrested for possession of fraudulent documents. Conspirator Robert Belvin counseled the two remaining workers to keep their identification documents in the trunk of their vehicles in order to avoid arrest for possession of false documents and told them they could move from one IFCO house to another if they were concerned that the police would come to the one at which they were living.

39.     On or about October 20, 2005, defendant **WENDY MUDRA** instructed IFCO assistant general managers at a meeting in Atlanta, GA, including conspirator Dario Salzano, that when former IFCO pallet workers reapplied for employment with different social security numbers, the managers were to make sure to re-hire the workers using the social security number the employee had first used.

40.     On December 1, 2005, defendant **WILLIAM HOSKINS** sent an email to conspirators Robert Belvin and Dario Salzano directing them to ask their employees of the location of a Hispanic grocery or authentic restaurant and to hang out there or pass out cards in order to recruit additional pallet workers for the plant.

41.     In or about November 2005 and December 2005, conspirators, including defendant **WILLIAM HOSKINS** and other IFCO managers, attempted to transport a group of illegal aliens from the Houston area to Albany to work at the Albany plant. The conspirators did the following acts, among others:

        a.      On or about November 30, 2005, after learning that the potential workers were afraid to ride the bus to Albany out of fear of detection by immigration authorities, defendant **WILLIAM HOSKINS** directed the government cooperating witness working at the IFCO plant to travel to Houston, rent a van, and transport the illegal aliens to Albany;

        b.      In December 2005, conspirators Robert Belvin, Lino Chicas, and the government cooperating witness negotiated with another person in Houston to transport the aliens from Houston to Albany in exchange for a fee;

        c.      On or about December 14, 2005, the government cooperating witness called defendant **WILLIAM HOSKINS** to tell him that he had learned from the person organizing the transportation of the illegal alien workers to the plant that the workers were held up because two of them had a problem getting social security cards and ID. The cooperating witness asked **HOSKINS** if he would help the workers with "gas money and stuff" to get to the plant. **HOSKINS** stated that he would help them and to "Just get them here and we'll deal with it."

42.     In December 2005, defendant **WILLIAM HOSKINS** directed IFCO Albany managers to look for additional housing for pallet workers from the plant, including an extra apartment on the second floor of "the yellow house" located at 454 State Route 146, Guilderland Center, NY. On February 1, 2006, pursuant to this instruction, the new general manager at the Albany plant executed a lease for the housing. Illegal alien workers resided in the house until date of the ICE enforcement action.

14

43.    In January 2006, Defendant **TOMAS SOTO CASTILLO** drove an illegal alien, known as N.G., from Cincinnati to the Albany and paid for him to stay in a hotel.  The worker was hired at the Albany plant and remained there until the ICE immigration enforcement action.

44.    In February 2006, conspirator Dario Salzano hired an alien pallet worker, known as M.F., defendant **TOMAS SOTO CASTILLO** had sent to the Albany plant from Cincinnati because he had problems with the police in Cincinnati.  Salzano hired the worker under the name M.F. and the social security number the worker provided, but when IFCO's payroll department notified him that the worker used a different social security number at the Cincinnati plant, terminated the employee and rehired him under a completely different name and social security number, with different identity documents.

45.    On February 10, 2006, the Albany office manager notified defendant **WENDY MUDRA** by email that a pallet worker who had been working at the Albany plant, U.O., wanted to change his name and social security number on IFCO's payroll and to reduce his tax withholdings from 8 to zero.  **MUDRA** responded, in part, "This typically means that we will have to terminate the "old" him and hire the "new" him."  **MUDRA** subsequently told the office manager and an IFCO payroll employee by email, "We'll terminate him [U.O.] under his old name and hire him under his new name."

46.    In or about March 2006, Albany managers, including conspirator Dario Salzano, learned from a local police officer that the plant foreman had been involved in an automobile accident and had provided police a different identity than the one under which he was employed. The foreman told Salzano that he was using another identity due to legal problems in another state.  Managers allowed the foreman to remain employed at the Albany plant under the identity he was using until the date of the ICE enforcement action.

47.    IFCO conspirator managers helped illegal alien, V.R., enter the United States, travel to Albany, and work at the Albany plant under a fraudulent identity.  Acts in support of this illegal entry and employment included the following:

a.    On or about January 28, 2005, Robert Belvin and Craig Losurdo advanced $500 in company funds to V.R's son, a pallet worker at the plant, to help pay for V.R.'s illegal entry into the United States.

     b.     In February 2005, knowing that V.R. had illegally entered the country, Lino Chicas arranged for V.R.'s lodging and transportation within Texas and to the Albany plant.

     c.     In April 2005, after Robert Belvin told him that payroll had rejected the social security number V.R. submitted because it was being used by another worker at the plant, Albany foreman Misael Romero asked the government cooperating witness to obtain a fraudulent social security card for V.R. when the witness bought his own fraudulent documents.

     d.     Albany managers attempted to use the fraudulent social security card the cooperating witness brought to them (with ICE assistance) to get V.R. paid, but IFCO's third party payroll company rejected it.

     e.     Albany managers employed V.R. at the Albany plant for approximately seven weeks and paid him with manual checks because he lacked a usable social security number. James Rice instructed the Albany managers to give V.R. a week's leave of absence for him to obtain identification documents.

     f.     On April 26, 2005, conspirator Robert Belvin asked the government cooperating witness to purchase fraudulent work authorization documents for V.R. and four other illegal alien workers at the plant.

     g.     On May 13, 2005, after James Rice notified IFCO's Payroll Manager and IFCO's Controller that V.R. was being given a week to produce documents, the Payroll Manager sent the Controller an email stating that payroll V.R. already had produced two different numbers that IFCO's payroll company had identified as invalid. The Payroll Supervisor questioned, "Are we now looking at giving him another week?"

     h.     On May 16, 2005, when the cooperating witness produced fraudulent identification documents for V.R. (with ICE assistance), conspirator Albany managers "hired" V.R. in his new fraudulent identity. V.R. remained employed at the plant until the date of the ICE enforcement action.

<u>Overt Acts Concerning the Detroit Plant</u>

48.     On December 27, 2004, defendant **WILLIAM HOSKINS** promoted an illegal alien worker, known as J.N., who had been working at the Cincinnati IFCO plant, to be the foreman of the Detroit plant. **HOSKINS** "hired" the foreman under a different name and social

security number than the worker had been using for employment at the Cincinnati plant and completed an I-9 form for the worker, accepting as proof of employment eligibility, an identification card from Tennessee and an unsigned social security card.

  49. On December 29 and 30, 2004, defendant **WILLIAM HOSKINS** secured an apartment for the illegal alien foreman of the Detroit plant, known as J.N. **HOSKINS** accompanied J.N. at a meeting with the property manager, completed the rental application for J.N. (submitting in support, pay records from the Cincinnati plant in J.N.'s previous identity along with identity documents under that name), and wrote a letter to the property manager in order to obtain the rental. The letter, which **HOSKINS** wrote on company letterhead stated, in part, "IFCO Systems has recently moved in to the Livonia area and will be bringing many employees to the area who will be in need of apartments. I am confident that they will be great tenants and IFCO Systems will provide any type of voucher for their pay and behavior."

  50. On January 12, 2005, defendant **WILLIAM HOSKINS** rented an apartment to house at least five Hispanic alien workers he and defendant **TOMAS SOTO CASTILLO** moved to Detroit to staff the plant. **HOSKINS** advanced $1,500 of company funds to the workers for rental costs and other expenses. Illegal alien workers from the Detroit plant lived in the apartment until the date of the ICE enforcement action.

Overt Acts Concerning the Rittman Plant

  51. In or about December 2004, at the direction of New Market Development Manager Steve Means, the general manager of the Rittman plant secured apartments within walking distance of the plant to house the Hispanic alien workers being hired at the plant. Nearly all of the illegal alien pallet workers from the plant resided at these apartments until the date of the ICE enforcement action.

  52. Between in or about December 2004, and April 19, 2006, managers hired numerous alien pallet workers at the plant without properly completing I-9 forms for the workers.

  53. On March 19, 2005, the general manager of the Rittman plant sent an email to an IFCO Regional Vice President stating, in part:

> I learned on Friday that the liquor store where my guys are cashing their checks is charging them 2% and they have to travel to Orrville to do it. As a service to these guys I would like to consider cashing their check at no cost. This would be

17

beneficial in two ways: 1) They bond more with their "padron" because he's looking out for them and saving them money. 2) Keeps them out of Orville where [a person] just last week, was telling me a stone grinding company has been recruiting cheap Hispanic labor and promising them the moon.... I know Tomos and others have cashed checks as a small side business. I don't want [the Rittman foreman] doing that for a couple of reasons and I don't want to miss the opportunity to build loyalty with my workforce....

The IFCO Regional Vice President responded that the managers "best bet" was to establish a relationship at the bank the plant used to cash the workers checks at no charge. He advised: "It would also be wise to encourage them to set up checking or savings accounts to make things easier for themselves around town. I know that's not easy but I could work through Tomas [and another foreman] to get it across to them."

54. At a time after March 19, 2005, the general manager of the Rittman plant went to two local banks to intervene on behalf of the Hispanic alien pallet workers from the plant. The first bank declined to cash the workers' paychecks because the workers did not want to open bank accounts. The other bank agreed to cash the workers' checks after the general manager met with the bank manager and introduced the employees to the bank staff.

Overt Acts Concerning the Boston Plant

55. On October 5, 2005, when the government cooperating witness, who was tasked to staff the Boston plant, inquired of James Rice whether it would be okay to staff the plant with illegal workers like those in Albany. Rice told him that the workers had to have the "right ID" though he was not an "expert" regarding documents and it would be the "same deal" as at the Albany plant.

56. On October 18, 2005, in a conversation with the government cooperating witness at the Boston plant, defendant **TOMAS SOTO CASTILLO** said that it was "no problem" and he did not care if the workers being hired for the plant were "not legal" and had "no papers." **SOTO CASTILLO** stated, "I hire all you people, nobody knows."

57. On October 20, 2005, conspirator Mike Ames took the government cooperating witness to a bakery where Brazilian day laborers congregated to recruit pallet workers for the plant. The cooperating witness informed Ames what a woman at the bakery said about the potential workers that "They have no documents, no paper, no permission to work in the United

18

States." Ames instructed the cooperating witness to "work the deal" so that the workers could get paid for working and not have problems getting paid because of ID problems.

58.     On October 25, 2005, the government cooperating witness told James Rice that he was afraid that the police would stop him while he was transporting the Boston plant's alien workers from Albany, where they were training, back to Boston. The cooperating witness expressed concern that he and the workers, who possessed false immigration documents, would be deported if caught. Rice directed him to put the workers on a bus.

59.     In or about November 4, 2005, conspirator Robert Belvin purchased bus transportation for seven of the Brazilian illegal alien workers to return to the Boston plant from Albany, including two workers whom managers believed were leaving Albany to avoid immigration problems. Belvin purchased the bus tickets and vouched for the alien workers to allow their travel. Belvin further instructed the illegal alien workers to remain in the bus facility to avoid being detected.

60.     From in or about October 2005 through April 19, 2005, managers at the Boston plant hired numerous alien pallet workers at the plant without properly completing I-9 forms for the workers.

61.     On December 7, 2005, New Market Development Manager Steve Means, hired illegal alien L.C. whom defendant **TOMAS SOTO CASTILLO** had recruited to be the foreman of the Boston plant, accepting as proof of employment, an expired Kentucky Driver's License, a Honduran passport, and social security card valid only for work with INS Authorization of which L.C. presented no proof. Means reimbursed L.C. the cost of transportation to the Boston plant from Cincinnati. **SOTO CASTILLO** paid for L.C. to stay in a hotel room near the plant from December 5, 2005, through December 12, 2005.

62.     On December 15, 2005, Steve Means sent an email to IFCO's Vice President for Human Resources, defendant **CHARLES DAVIDSON**, and conspirator Mike Ames requesting authorization for a $2,000 advance in company funds to L.C. The email stated, in part:

> As usual we are facing a couple of challenges with our workforce in Boston. Mr. Tomas Soto has relocated several guys to Boston and they need our assistance as they settle in. We currently are paying for them to stay in a hotel near the yard and [the assistant general manager] and Mike [Ames] are providing transportation

to and from the plant each day. The employee who is working as our foreman has asked if we can provide him with a 'relocation assistance advance' to help him get set up. He will in turn take care of the rest of the guys. What is the best way to approach this. Right now we are paying $500 + weekly to put these guys up in a hotel and providing all transportation. I'd like to give a $2,000 advance to [L.C.] and have Tomas help him wrap this personal stuff up when he is here next week.

The Human Resources Vice President responded with a repayment agreement form to use for the advance, to which defendant **CHARLES DAVIDSON** responded, "Thanks."

63.     In December 2005, at the direction of defendant **CHARLES DAVIDSON** and Steve Means, conspirator Mike Ames and the assistant general manager of the plant undertook a search for housing for the Hispanic alien workers that had been hired at the plant.

64.     In December 2005, at the direction of conspirator Mike Ames, the assistant general manager took a group of Hispanic alien pallet workers to a local bank to open accounts so that the workers would have bank accounts if needed for credit check purposes to secure an apartment. At the bank, bank officials declined to open accounts for the workers because they lacked proper identification documents. The assistant general manager took the workers to a second branch of the bank where he convinced the bank manager to open accounts for at least three of the workers by showing the manager an IFCO paycheck written off of the bank's account and stating that the employees should be able to open an account because they would be cashing valid checks there.

65.     On or about January 7, 2006, at the direction of defendant **CHARLES DAVIDSON** and Steve Means, conspirator Mike Ames executed a lease for an apartment in L.C.'s name to be used to house the Hispanic alien workers from the Boston plant. Ames applied for the apartment and wrote a letter on company letterhead vouching for the employee prospective tenants which stated, in part, "The above mentioned employee's are fully supported by IFCO Systems. In the event that they fail to pay the monthly rate of $900, IFCO will make the payment." Ames further paid the first month's rent and security deposit with funds advanced to L.C. and handled payment of the monthly rent. Hispanic illegal aliens from the Boston plant resided at the apartment until the date of the ICE enforcement action.

66.     Sometime in December 2005, or January 2006, when the assistant general manager of the Boston IFCO plant questioned the genuineness of a social security card an applicant presented for employment, Steve Means instructed the manager that he did not have to be a document expert and he could not question the validity of the card.

67.     In or about March 2006, after the foreman at the Boston plant, L.C., told conspirator Mike Ames that all of the pallet workers were illegal aliens, Ames reported this to Steve Means. Means told Ames that the foreman was just joking and that in any event, managers were not allowed to question the workers' identity documents.

68.     From December 2005, through at least March 2006, conspirator Mike Ames and the assistant general manager transported Hispanic alien workers to and from work on a daily basis, purchased food for these workers, and gave them company funds to buy food.

Overt Acts Concerning the St. Louis Plant

69.     In or about July 2005, the defendant **TOMAS SOTO CASTILLO** purchased a bus ticket for a Hispanic alien, known as A.F., to travel from Cincinnati to work at the St. Louis plant.

70.     On or about July 14, 2005, a manager at the St. Louis plant reimbursed an alien, known as M.V., the cost of his bus transportation to the plant from Cincinnati.

71.     On or about July 14, 2005, and July 15, 2005, respectively, managers hired M.V. and A.F. at the St. Louis plant without properly completing I-9 forms and without obtaining sufficient employment documentation.

72.     On or about July 21, 2005, a manager of the St. Louis plant obtained an apartment for M.V. and A.F. listing defendant **TOMAS SOTO CASTILLO** as the workers' boss on the apartment application.

73.     In July 2005, the managers of the St. Louis plant submitted to IFCO's payroll department W-4 forms in which alien pallet workers from the plant claimed exceptionally high allowances, some as high as 22.

74.     On August 4, 2005, an IFCO payroll employee sent an email to the St. Louis managers stating, in part, "I've noticed that a lot of your new hires filing tax status at Married with over 10 allowances (ex. M-13, M-15, M-18). Please be sure your employees are aware that

if they claim over 10 exemptions, by law IFCO needs to send a copy of their W-4 and information to the IRS."

75.     Between in or about July 2005, and April 19, 2006, managers hired numerous alien pallet workers at the St. Louis plant either without completing I-9 forms for the workers, or improperly completing I-9 forms.

Overt Acts Concerning the Salt Lake City Plant

76.     In November 2005, defendant **TOMAS SOTO CASTILLO** sent two illegal alien relatives who were working at the Cincinnati IFCO plant and living in his house, known as J.A.B.A. and J.C.P.E., to staff the start-up plant in Salt Lake City (SLC).

77.     In November 2005, **SOTO CASTILLO** sent an illegal alien A.S.E.G., who lived in his house in Cincinnati and worked at the IFCO plant there, to SLC to work at that plant.

78.     On November 28, 2005, defendant New Market Development Manager **BRYAN BAILEY** "hired" J.A.B.A., who had been working at the Cincinnati IFCO plant under the name O.A.R.P., as a new employee, in a different identity and with different documents than the worker had been employed under in Cincinnati.  J.A.B.A. was terminated in Cincinnati under his old identity.

79.     On or about December 2005, defendant **BRYAN BAILEY** and another made the alien known as J.A.B.A. the plant foreman and tasked him with hiring laborers for the plant.

80.     On or about December 7, 2005, defendant **BRYAN BAILEY** sent an email to Steve Means inquiring about how they might make up a shortage in J.B.A.'s last paycheck from the Cincinnati plant as "He is no longer employed with IFCO as far as payroll is concerned." **BAILEY** suggested explaining the situation to IFCO's payroll manager to see if she would be able to help out as he was "not sure how we're going to get money for someone that doesn't exist anymore."

81.     On November 30, 2005, with approval from defendant **CHARLES DAVIDSON**, managers at the SLC plant advanced $1900 in cash to the alien pallet workers known as J.B.A., J.P.E. and A.S.E.G., for the purpose of obtaining housing.  Defendant **BRYAN BAILEY** wrote a company check for that amount to a plant manager, who in turn cashed the check and provided the cash to defendant **TOMAS SOTO CASTILLO**.  **SOTO CASTILLO** paid the cash to a

22

landlord for a deposit and first month's rent for the workers.

82.     On March 7, 2006, defendant **TOMAS SOTO CASTILLO** purchased a bus ticket for his illegal alien relative, known as J.V.A., who lived in his house in Cincinnati and worked at the IFCO plant there, to travel from Cincinnati to work at the SLC plant.

83.     On Friday, April 7, 2006, the general manager of IFCO's Cincinnati plant sent an email to the general manager of the SLC plant which read, "I am sending some talent your way. They should be there Monday. 2 guys, one of mine and one fresh off the boat." The SLC manager responded, "I appreciate that more than you know. Apparently, the boats here go straight to restaurants and they don't like working anywhere else."

84.     On April 7, 2006, defendant **TOMAS SOTO CASTILLO** purchased a bus ticket for an illegal alien, known as C.M., who had lived in his house in Cincinnati and was presently working at the IFCO plant there, and for illegal alien, known as M.G., to travel from Cincinnati to SLC.

85.     On Monday, April 10, 2006, the SLC general manager sent an email to defendant **BRYAN BAILEY** notifying him that foreman J.B.A. had found two new workers over the weekend, but "The two guys from Cinci apparently got by [sic] immigration in Detroit for not having proper ID."

86.     On April 10, 2006, the alien known as M.G. was hired at the SLC plant.

87.     On April 12, 2006, defendant **BRYAN BAILEY** sent an email to the SLC general manager stating, in part, "I talked to Tomas yesterday about the two guys coming from Cincy. He said one made it, and the other got picked up in Detroit (as you had said). Regardless, we're going to have to pay the bus fare on both of them.... Tomas is going to expense it to our location."

### Overt Acts Regarding Social Security Numbers Used by IFCO Pallet Workers

88.     After receiving several "Employer Correction Requests" from the Social Security Administration (SSA) in or about April 2004, and April 2005, that notified IFCO of hundreds of discrepancies or "mismatches" between the employee names and social security numbers that IFCO reported on its Wage and Tax Statements for the previous year, and SSA's records, IFCO managers failed to take proper steps to correct the social security discrepancies.

89.     In June 2005, an office manager from the IFCO plant in Jackson, MS, submitted

an invalid social security card for a pallet worker known as P.B. to IFCO's payroll department.

Payroll rejected the card and IFCO's Payroll Supervisor subsequently sent the office manager an

email, copying the plant's manager defendant **BRYAN BAILEY**, IFCO's Payroll Manager and

IFCO's Controller explaining why the card was rejected. The email stated, in part:

> [T]here is a difference between using a valid SSN that does not belong to
> someone and an invalid SSN. The issue is not that we don't "want" to accept it.
> It is an Invalid number and no SSNs begin with "9." We're not out to get people
> deported. There will have to be a mutual understanding though, of what payroll
> can and cannot accept."

90.     In June 2005, an office manager from IFCO's Jackson plant submitted a second

social security card for the pallet worker known as P.B. which was identical to the first card

except that the first digit was a "6" instead of a "9." An IFCO payroll employee called the SSA

to verify the second social security number and was told by SSA that the number did not match

the identity of the worker. IFCO's Payroll Supervisor reprimanded the payroll employee for

calling SSA and IFCO's Controller told her that if she ever called to verify a social security

number again, she would be fired. The worker known as P.B. was hired at the Jackson plant with

the second social security number and remained employed there until the date of the ICE

enforcement action.

91.     On June 17, 2005, in an email to IFCO's Payroll Manager and IFCO's Controller,

IFCO's Payroll Supervisor reported the instructions she had given the payroll employee who had

called SSA to verify the second social security number for P.B. the Jackson plant had submitted:

> **6/16/05**
> [The payroll employee] came to me today and showed me [the alien worker's] 2nd
> SS card. She had already called the SSA to verify the validity. When the info
> didn't match, they gave her the expected response of sending the ee to the SSA.
> [The payroll employee] told [the office manager] just that. I told her that was not
> what we had discussed and that she was to accept it and run it thru [IFCO's third-
> party payroll company]. If it rejected again, we would deal with that. She argued
> that, because his first one was invalid, that she felt compelled to call. She said it
> was different if it was a bad number the first time and [the payroll company]
> accepted the number. Then she just wasn't aware. But once the 1st one is invalid,
> how can she accept one she knows is probably not his? I said she was
> rationalizing why she called and that she was not to call and she should take it at

24

face value. I reiterated that it was not up to us -- that the higher-ups had passed that down and that should relieve her of any responsibility.

THEN, I immediately called [the office manager] and told her we'd accept it, and we'd let her know if it rejected again.

**6/16/05**
Spoke with [the payroll employee] this morning. This is what we discussed regarding SSNs:
- Never call SSA to verify
- Never tell locations that the card won't be accepted
- Accept every card and tell me when it rejects

I said these points are non-negotiable....

Brian Bailey called me this morning to ask what we could do about this situation. I told him what I had discussed with her and assured him that she will accept all SSNs and will tell me when one rejects. I will handle it from then on. She is not to do any follow up. He has no problems telling the guys that they need to get a new card if the SSN is invalid. I told Brian that [the Controller] is aware of all this and to feel free to call and discuss at any time. He said he would just as soon handle it with me, since [the payroll employee] reports to me.

The Controller responded to the email stating, in part, that he would discuss the situation with IFCO's Vice President for Finance and Accounting that day.

92. On November 22, 2005, IFCO's Payroll Supervisor sent an email to defendant **WENDY MUDRA** and IFCO's Controller entitled "Bad/Questionable SSNs." The email asked for advice on how to handle "Employees that have been hired with one name and SSN and then provide another name and SSN – different locations – different states." The IFCO Controller responded with an email to defendant **WENDY MUDRA**, and IFCO's Vice Presidents for Human Resources for Finance and Accounting, stating, in part "I do not see where we can have an employee with two or more Socials and two or more names in the system." Defendant **WENDY MUDRA** stated, "Typically, this is the method we have used in the past. When we rehire somebody, we must rehire them as their original identity. If they can't produce the ID, we pay them as contractors."

93. In or about December 2005, the new IFCO Payroll Supervisor suggested that the company run a batch check with the SSA to identify problem social security numbers in order to

25

remedy the extraordinary error rate in relation to the Social Security numbers that were being submitted to the payroll department from the various plants around the country. Defendant **WENDY MUDRA**, IFCO's Controller, and IFCO's Vice President for Finance and Accounting forbade the Payroll Manager from running such a check and told him that it would result in the loss of half of the company's workforce.

94.     On December 29, 2005, a payroll employee notified defendant **WENDY MUDRA**, IFCO's Vice President for Human Resources, IFCO's Controller, and another, that IFCO's third party payroll company had refused to allow a worker because he had an invalid social security card. **MUDRA** responded, "How did ADP know this?" When the payroll employee reported that "there are numbers that the IRS does not use for social security numbers and [the payroll company] has it set up in their system that whenever a bad number is used it rejects it," **MUDRA** forwarded that email to the recipients on the original email and IFCO's Vice President for Finance and Accounting and stated, "This may present some problems for us."

95.     On April 12, 2006, IFCO's Payroll Manager sent an email to defendant **WENDY MUDRA** and IFCO's Vice President for Human Resources stating, "Guess what?! We have around 250 envelopes from the IRS and each envelope contains two sets of documents as attached [a social security mismatch notification]. How would you like us to proceed with these?" Neither **MUDRA** nor the Human Resources Vice President provided a response to the email.

All in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(ii), (iii), (iv), and (v)(I).

## COUNT TWO
### (Aiding and Abetting the Harboring of Illegal Aliens)

From on or about October 2004, through on or about April 19, 2006, in the State and Northern District of New York, and elsewhere, the defendants,

### CHARLES DAVIDSON, WILLIAM HOSKINS,
### TOMAS SOTO CASTILLO and WENDY MUDRA

and others, aided and abetted the concealment, harboring, and shielding from detection, and the attempted concealment, harboring, and shielding from detection, of aliens, knowing and in

reckless disregard of the fact that the aliens had come to, entered, and remained in the United States in violation of law, contrary to Title 8, United States Code, Section 1324(a)(1)(A)(iii),

In violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(II), and 18 United States Code, Section 2.

## COUNT THREE
### (Encouraging and Inducing Illegal Aliens to Reside in the United States)

From at least in or about in or about October 2004, through in or about April 19, 2006, in the State and Northern District of New York, and elsewhere, the defendants,

### CHARLES DAVIDSON, WILLIAM HOSKINS,
### TOMAS SOTO CASTILLO and WENDY MUDRA

and others, encouraged and induced aliens to reside in the United States, knowing and in reckless disregard of the fact that such residence was and would be in violation of law,

In violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

## COUNTS FOUR AND FIVE
### (Transportation of Illegal Aliens)

In or about October 2004, in Albany County, in the State and Northern District of New York, and elsewhere, defendant

### TOMAS SOTO CASTILLO,

transported and moved the aliens listed below within the United States, knowing and in reckless disregard of the fact that the aliens had come to, entered, and remained in the United States in violation of law, and in furtherance of such violation of law, for the purpose of commercial advantage and private financial gain,

Count 4 – the alien known as R.R.

Count 5 – the alien known as V.F.

In violation of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (a)(1)(B)(I).

## COUNT SIX
### (Transportation of an Illegal Alien)

In or about January 2006, in Albany County, in the State and Northern District of New York, and elsewhere, defendant

### TOMAS SOTO CASTILLO,

transported and moved the alien listed below within the United States, knowing and in reckless disregard of the fact that the alien had come to, entered, and remained in the United States in violation of law, and in furtherance of such violation of law, for the purpose of commercial advantage and private financial gain,

Count 6 – the alien known as N.G.

In violation of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (a)(1)(B)(I).

A TRUE BILL,

_____
FOREPERSON OF THE GRAND JURY

GLENN T. SUDDABY
UNITED STATES ATTORNEY

By: _____
Tina E. Sciocchetti
Assistant United States Attorney

28