IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| VS. | §   CRIMINAL NO. H-10-201-4S |
| | § |
| CHARLES M. DAVIDSON, | § |
| WENDY MUDRA, | § |
| CHRISTOPHER TIESMAN, | § |
| KENNETH GINES, JR., and | § |
| HASKELL "BUDDY" ROSS | § |

### SENTENCING MEMORANDUM

#### Introduction

On September 15, 2011, the five named defendants pled guilty to the offense of unlawful employment of illegal aliens at IFCO plants, between the time period January 2003 through April 19, 2006. The latter date represents the date on which immigration agents conducted a nationwide worksite enforcement action at approximately 45 IFCO pallet plants, encountering 1,181 undocumented workers at the plants. This number of workers represented the majority of the workforce at the plants at that time, included nearly every foreman at the plants, and did not reflect pallet workers who worked on other shifts at the plants. Records from the Social Security Administration reflected that over 50% of IFCO's workforce was using invalid social security numbers or those belonging to someone else (less than a 1% no-match rate is typical), and the government's evidence shows that over the three-year period, IFCO's payroll department caused to be submitted invalid W-2 forms to the IRS and SSA for over 7,000 employees.

This memorandum is submitted to inform the Court about the government's evidence, in part, concerning the scope of the criminal conduct at IFCO, to identify the roles of the respective defendants in that conduct, and to educate the Court about the status of the co-defendant conspirator IFCO managers who have entered into plea and cooperation agreements in the NDNY. The

1

memorandum concludes with a sentencing recommendation as to each defendant.

## Overview of the Case

During the relevant time period, the defendants were managers and senior managers at IFCO, which owned and operated approximately 50 pallet repair services plants, conducted pallet repair services at off-site facilities, and operated a number of crating and packaging, and reusable plastic container plants, throughout the United States. The charges returned by the Grand Jury, which stem from IFCO's employment over the years of thousands of illegal aliens from Mexico and Central America to work in the plants, are based upon the defendants' various roles in encouraging, facilitating, and protecting the company-wide employment of the illegal aliens.

## The Defendants

Defendant **Charles M. Davidson** was originally an owner and manager of a pallet repair plant in San Antonio, Texas. Following the mergers of several pallet companies that became IFCO in 2000, he became the Regional Vice President for the Western Region in the company. In or about late 2003 or early 2004, he became the Director of New Market Development, where he oversaw the "Greenfield Program," to establish new IFCO plants.

Defendant **Christopher Tiesman** previously worked for one of the predecessor companies that became IFCO, and shortly after the merger, became the Vice President for Accounting and Finance at IFCO. He oversaw the payroll and accounting departments, which were located in Houston, Texas.

Defendant **Kenneth Gines** began working at IFCO in or about 2001, and served as the Controller of the Pallet Services Division under defendant Christopher Tiesman. He also oversaw the payroll department in Houston.

Defendant **Haskell "Buddy" Ross** worked in Human Resources for one of IFCO's predecessor companies and some time after the 2000 merger became the Vice President for Human

Resources based in Florida. For several years, the HR Department essentially consisted of the defendant and another person, an HR and Safety Manager, who worked from Texas.

In November 2004, defendant **Wendy Mudra** was hired as a Human Resources Manager for IFCO, and worked under defendant Ross in the Tampa, Florida office. During much of 2005 and 2006, defendants Ross and Mudra also supervised the payroll department in Houston from their offices in Tampa.

## The Nature of the Government's Evidence

From their jobs in the company, the defendants helped to shape a manual workforce in the IFCO plants that was overwhelmingly Hispanic and largely undocumented. The operation of the plants invariably included: the use of a Hispanic foreman to recruit employees; preferential hiring of Hispanic workers over other ethnic groups; housing and transportation assistance for the workers to get to the plants; transporting workers (at the company's expense) among IFCO plants around the country, etc. In 2003, IFCO formalized its plants to expand its operations and establish new plants as a "New Market Development," or "Greenfield" program under defendant Charles Davidson.

The establishment of the new Greenfield plants - which eventually were located in Minneapolis, MN (Spring 2004); Albany, NY (October 2004); Detroit, MI (December 2004); Rittman, OH (December 2004); Portland, OR (March 2005); St. Louis, MO (July 2005); Westborough, MA (December 2005); and Salt Lake City, UT (December 2005) - relied upon and illustrated the same practices and policies that had created the largely unauthorized workforces in the other IFCO plants. To establish the new plants, defendant Davidson and his four New Market Development Managers relied upon *Tomas Soto Castillo* (a long-time foreman who worked in IFCO's Cincinnati plant) and *Abelino Chicas* (a long-time foreman who worked in IFCO's Houston plant) to staff the plants, set up the equipment, and train the new pallet workers.

Davidson's New Market Development Managers were: *James Rice*, a regional manager based in Houston; *William Hoskins*, the former General Manager of the Cincinnati plant; *Steven Means*, the former General Manager of the Columbus, OH plant; and *Bryan Bailey*, the former General Manager of the Jackson, MS plant. Rice and Hoskins each pleaded guilty to a felony offense in the NDNY; while Bailey and Means each pleaded to misdemeanors.[1] From his position at the Houston plant, Rice had a longstanding working relationship with Abelino Chicas and had worked with Soto Castillo; Hoskins, Means, and Bailey all had ties to the Cincinnati plant, which employed Soto Casitillo as its foreman, while Hoskins and Means had both worked directly with Soto Castillo.[2] Thus, while the New Market Development Team relied primarily on Soto Castillo to recruit the Hispanic pallet workers, assist in the hiring process, and provide the initial training, Rice also used Chicas to help staff the Albany plant. Chicas and Soto each pleaded guilty to felony offenses in the NDNY.

With the approval of and even under instructions from defendants Ross, Gines, and Mudra, plant managers or their surrogates accepted questionable forms of identification; hired and rehired the same people under different names; accepted SSN's that they knew or had reason to believe were

---

[1] A more complete explanation of the pleas by the eleven other defendants in this case is provided in the chart which is attached to this document. *See* Attachment 1 (Chart of Cooperating NDNY Co-Defendants).

[2] It was clearly understood within IFCO what roles Soto Castillo and (to a lesser extent) Chicas played in establishing the plants, and emails, in which Davidson participated, demonstrate frequent negotiations for Soto Castillo's time, extensive discussion about how he should be compensated and from what internal budgets, and a general concern to keep him happy. Although Soto Castillo helped to set up the equipment and, in effect, get the plant "on-line," his chief function was to recruit and create a stable Hispanic workforce for the plant. To that end, he visited Hispanic restaurants, spoke with Hispanic workers at other pallet companies (or employed in businesses known to rely upon Hispanic - and undocumented - workers, like the Saratoga Race Track), and generally cultivated the local Hispanic community. Once an employee was hired, he was encouraged to seek out and recruit other employees from among his friends and family.

invalid; and followed a "policy" of rehiring people under the original SSN they had provided if the worker reappeared with a "new" SSN.

The defendants also endorsed and approved extraordinary services for the workers that were typically arranged for by or through the plant general managers and assistant general managers, and would not have been required for a workforce that was legally established in the United States. The defendants, particularly Davidson, Ross, and Mudra, directed and approved housing assistance including: allowing IFCO to be named as the lessee on apartments for the workers; providing advances to the workers to pay the initial deposit and first month's rent; and even having IFCO actually handle the rent payments. In addition to approving the expenses for the housing assistance, defendants Gines and Tiesman also permitted and approved unusual transportation expenses, including reimbursing the costs of bringing the workers to the plants, and paying for manual workers to move from one plant to another.

The plant managers who have pleaded guilty in this case were *Robert Belvin* (IFCO Albany plant), who pleaded guilty to two felonies, and *Michael Ames* (IFCO's Westborough/Boston plant), who pleaded guilty to a misdemeanor. Three assistant general managers from the Albany plant, *Scott Dodge, Craig Losurdo*, and *Dario Salzano*, also pleaded guilty to misdemeanor offenses in the NDNY.

In addition to the evidence that defendants shaped a manual workforce that was substantially unauthorized, the defendants further protected the unauthorized workforce by deliberately ignoring any evidence of the workers' questionable status, and failing - even when problems were presented - to develop any practices or system to verify the legality of the workers being hired. Every year, the Social Security Administration sent letters to IFCO indicating that hundreds (thousands over time) of SSN's provided by IFCO employees were irregular or questionable. Over the years, the defendants, especially defendant Ross, blocked the efforts of employees at the plants to follow the

procedures outlined by the SSA for dealing with the letters, tried to pass the responsibility for dealing with the letters from the payroll department (defendants Gines and Tiesman), and eventually just ignored them.  Payroll employees who questioned what they were seeing were instructed not to attempt to verify the SSN's of the plant employees - and warned they would be disciplined or terminated if they did.  When one payroll employee called the SSA to verify a number that had been provided by an employee, whose previous number had already been determined to be invalid, defendants Gines and Tiesman instructed that she be written up as a disciplinary measure.  Similarly, payroll managers who suggested ways of verifying the documents or the information provided with them were told by defendants Ross and Tiesman that IFCO would lose a substantial portion of its workforce if they did.

The defendants played the following roles and committed the following acts as part of the pattern and practice at IFCO of hiring illegal aliens to work in the plants.

**Charles M. Davidson**, as an original owner of a pallet company IFCO acquired and once-general manager of the San Antonio plant, had a long history in the pallet business and was aware of the workers IFCO hired.  In emails involving IFCO officials and including Davidson, the participants openly refer to the workers' ties to Mexico.  In other emails, Davidson is notified of the unorthodox hiring methods for pallet workers at Greenfield plants, such as searching for employees from among the horse stable workers at a local race track.  Davidson authorized the lease in IFCO's name of at least four apartments or houses for the Albany plant workers; approved an advance from IFCO funds for IFCO employees who had moved from Cincinnati to Salt Lake City to pay the first month's rent and deposit; approved an advance from IFCO funds for the Westborough, MA foreman to take care of the pallet workers' housing needs (so IFCO would no longer have to pay for the workers' hotel and daily transportation to and from work as the plant had done for months); and approved the lease of an apartment to house the Westborough plant workers. In February and March

2005, Davidson was specifically informed of, respectively, 1) an immigration investigation concerning the pallet workers at the Albany plant; and 2) an ICE raid on a house that had been rented by IFCO for its Albany pallet workers which resulted in the arrest of several workers and the panicked flight of others. Davidson's response was to encourage the Albany managers who told him that their workforce was composed of illegal aliens to remain employed at IFCO, and to refer them to Chicas and Soto for more workers. He took no steps to ensure that the managers verified the employment authorization of the remaining workers at the plant, but instead told the managers not to worry – that the fleeing workers would return once things calmed down (as it turned out, an accurate prediction). Further, Davidson knew that Greenfield plants were routinely staffed by individuals whom Chicas and Soto had found, and the company had transported to the plants from cities across the United States, instead of hiring people from the local community. Davidson was informed of SSA "no-match letters" concerning employees at the San Antonio plant – many of whom remained on the payroll years later and were apprehended during the April 19, 2006, enforcement action. He tracked and circulated several articles on immigration issues, including the danger associated with the employment of illegal aliens, to other IFCO executives, demonstrating an obvious concern about the issue for IFCO's senior management.

**Haskell "Buddy" Ross** was reminded on an annual basis of the numerous letters (listing hundreds of questionable SSNs) sent by the SSA to IFCO. Emails indicate that Ross variously told people to take little or no action, developed a tepid company response to the letters (that would not require the employees with suspect identification documents to do anything meaningful), and refused to take possession of the no-match letters, even though several people told him they were his (the HR Department's) responsibility. In at least one instance, in 2003, the HR and Safety Manager warned Ross that the background screens for IFCO pallet workers at the off-site third party contractors' distribution centers were "showing a very, very high percentage of bad (illegal) SSNs,"

7

and that "some were even issued <u>decades</u> before the person using them was even born."

On his own admission (in an email), Ross was aware that IFCO paid rent for at least some period of time for housing in Albany. In December 2005, he approved the form that Wendy Mudra created for employees to repay advances from IFCO - and knew of, or directed, that it be used for employee advances for housing and/or transportation in Salt Lake City and Westborough/Boston. In March 2006, Ross approved a loan to a Westborough employee to purchase a car to transport the workers to the plant. In May 2004, after a woman advised IFCO's payroll manager that her disabled brother stood to lose his social security benefits because an IFCO employee was using his SSN, Ross specifically instructed the payroll manager not to verify the SSN being used by the worker. In March or April 2005, Ross told IFCO's then-payroll manager to ignore "no-match" letters that the SSA had sent to IFCO. Finally, in any number of instances, as Wendy Mudra instructed plant employees how to hire workers with questionable SSNs or responded to questions concerning potential problems with W-2s and related issues, Ross was copied on the emails and either responded that they should talk or (in at least one instance) asked why he should care.

**Wendy Mudra** began working at IFCO under Buddy Ross in November 2004, and quickly became involved in overseeing the payroll department. On a regular basis, the payroll processors received incomplete, inadequate, and questionable documentation from the plants; processed frequent changes in the names and SSNs of employees; and routinely calculated the amounts for manual checks to be issued for employees who had not yet (or could not) provide the necessary documentation. There were specific instances in which Mudra instructed payroll employees who had questioned the rehiring of a worker who had presented a different SSN than he previously used, to hire the worker with the original SSN he used; to pay a worker who had presented a SSN already being used by another IFCO employee as a contractor and/or let him go until he could produce "an appropriate SSN;" to hire someone who had presented an invalid SSN, as long as he produced "valid

supporting" ID; to terminate an employee who wanted to change his SSN and to re-hire him under the new SSN he now presented; and asked third party benefit providers to change their records to accommodate the frequent SSN changes by IFCO's pallet workers so that the workers continued receiving benefits.[3]

In January 2006, the new Payroll Manager suggested to Mudra and Tiesman that IFCO verify the SSNs of its employees through the SSA (which offered the service at no cost), and they strongly forbade him to run such a check and told him that it would result in the loss of half of the company's workforce.  In May and June, 2005, Mudra participated in discussions concerning the difficulty of recouping the rent for the houses in Albany from the employees; in December 2005, she developed a form for employee advances in Salt Lake City; and later in December 2005, she sent the form to be used for an employee at the Westborough plant.

**Christopher Tiesman** told IFCO's then-payroll manager to ignore "no-match" letters that the SSA had sent to IFCO in April 2004, and again in April or May 2005.  In June 2005, Tiesman was involved in discussions concerning the discipline and write-up of a payroll processor for verifying the second SSN an employee had provided, after his first one had been shown to be invalid. In November 2005, Tiesman participated in discussions concerning how to handle a plant employee who had provided three names and two different SSNs.  In December 2005, Tiesman was warned by Mudra that the system of the third party payroll company (ADP) which blocked invalid SSNs from being submitted by IFCO's payroll processors could present problems for the company.  In January 2006, Tiesman and Mudra forbade the Payroll Manager to run a check of the employees'

---

[3]There were instances in which she instructed the plant employees that they could not hire some workers.  On closer examination, however, these instances typically involved some additional factor (such as public attention having been called to the worker) that made it riskier for IFCO to maintain the employee on the payroll.  Furthermore, while Mudra may have occasionally instructed a plant not to hire or to fire a worker, there typically was no follow-up to ensure that the plant complied.

SSNs with the SSA, and told him that it would result in the loss of half of the company's workforce. In addition, there is witness testimony that Tiesman warned the payroll processors that, if they ran checks with the SSA, they would be fired.

**Kenneth Gines, Jr.** was assigned to generally oversee the payroll department in 2002. In the fall of 2002, as part of an effort to centralize and unify IFCO's hiring and firing procedures, Gines oversaw and developed an Employee Data Change Form, that specifically provided for employees to change their names and SSNs and that was subsequently adopted and used throughout the company. Gines was involved in and aware of the rent payments made by IFCO for employee housing in Albany, as well as the disbursement of an advance to the Salt Lake City employees to pay their first month's rent and deposit. In April 2004, Gines was involved in conversations which led to Tiesman directing the payroll manager to ignore "no-match" letters that the SSA had sent to IFCO. At different times, Gines attempted to get Buddy Ross to take responsibility for the "no-match" letters from the SSA. In June 2005, he directed the then-payroll supervisor to "write up" an employee for having verified a second SSN supplied by a pallet worker who previously submitted an invalid SSN. In September 2005, Gines also held a disciplinary meeting with the employee, prominently including the incident in which she had verified the employees' second SSN. Finally, at different times in November and December 2005, Gines was involved in conversations concerning specific employees' with problematic SSNs. He also was a recipient of an email in which Mudra warned that ADP's rejection of invalid SSNs the company's payroll submitted for workers could present problems for IFCO.

## The Government's Sentencing Recommendation

As the attached chart of the IFCO managers who pled guilty and cooperated with the government early in the case reflects, those lower-level managers face incarceration (in some instances, terms of several years) as well as substantial fines. Fairness requires that each defendant

here – managers at the very top of IFCO's decision-making structure who set the culture of illegality under which their subordinates operated – receive a non-incarcerative sentence that includes at the very least, a substantial fine.

Respectfully yours,

JOSE ANGEL MORENO
United States Attorney

S/ *Tina E. Sciocchetti*

By: _____

TINA E. SCIOCCHETTI
SARA LORD
DAVID C. SEARLE
Assistant United States Attorneys